THE STATE, EX REL. THE MAYOR AND COUNCIL OF THE BOROUGH OF RUTHERFORD, v. THE HUDSON RIVER TRACTION COMPANY.

Argued November Term, 1904—Decided February 26, 1906.

1. Where under the General Traction act of 1893 (*Pamph. L., p.* 302, § 7; *Gen. Stat., p.* 3237, *pl.* 126) an ordinance is passed by the common council of a municipality granting a location of street railway tracks, subject to restrictions in the ordinance specified, the question whether such restrictions are reasonable is a question of fact, and the burden of proof is upon him who asserts them to be unreasonable.
2. The restrictions in the case under review—*Held*, not unreasonable.
3. The ordinance having been carried into effect by the construction, maintenance and operation of the street railway, the traction company and its successors in title, while retaining and enjoying the privileges and franchises granted by the ordinance, cannot resist the claim of the municipality for enforcement of the restrictions on the plea that the ordinance was *ultra vires* the municipal corporation.
4. Where an ordinance, granting a location for street railway tracks pursuant to the General Traction act of 1893 (*Pamph. L., p.* 302, § 7; *Gen. Stat., p.* 3237, *pl.* 126), contains restrictions in the form of covenants, requiring the traction company to pave the street in which the tracks are laid, the fact that performance of this covenant would to some extent relieve the municipal treasury from expense does not taint the proceeding, there being no interest on the part of the members of council beyond their interest as ordinary taxpayers. *Hope v. Linden Park Association*, 29 *Vroom* 627, distinguished.

5. An ordinance granted a location of street railway tracks to a traction company and its assigns subject to restrictions and conditions to be observed and performed by the grantee. *Held,* that the restrictions and conditions are obligatory upon any subsequent purchaser of the street railway tracks and franchises, even without an express assumption.

6. *Mandamus* is the proper remedy for enforcing performance by a traction company of its duty to pave a street pursuant to the terms of the ordinance granting to its predecessor the right to locate tracks in such street.

On application for *mandamus.*

Before Justices FORT and PITNEY.

For the relator, *John M. Bell.*

For the respondent, *Edmund W. Wakelee.*

The opinion of the court was delivered by

PITNEY, J.   This is a rule to show cause why a *mandamus* should not be issued against the Hudson River Traction Company requiring it to proceed forthwith to macadamize a section of Park avenue, in the borough of Rutherford, extending from the southerly side of Ridge road to the southerly side of Newell avenue, with six-inch macadam pavement, to be laid from gutter to gutter, as provided in section 9 of an ordinance of the borough, approved March 5th, 1895, whereby the right to construct, maintain and operate a street railway in certain streets within the borough (including Park avenue) was granted to the Union Traction Company, the predecessor in title of the respondent.

The matter has been heard upon an agreed statement of all the facts in the case. From this it appears that the Union Traction Company was incorporated November 2d, 1894, under the General Traction act of March 14th, 1893 (*Pamph. L.,* p. 302; *Gen. Stat.,* p. 3235); that, having filed in the office of the secretary of state a description and map of its proposed line of railway, this company, on December 10th, 1894, made application in writing to the mayor and council

of the borough of Rutherford for the location of its tracks and for permission to construct, maintain and operate a street railway upon certain streets of the borough. Upon this application the ordinance in question was passed, granting leave accordingly and establishing the terms, conditions and restrictions upon which the railway might be constructed, maintained and operated. Among the lines of railway provided for by the ordinance was a double line of tracks upon Park avenue, from the Erie railroad southerly to the borough limits, the tracks to be laid equidistant from the centre line of the avenue, the inside rails being four feet and four inches apart, and the gauge of the tracks being four feet eight and one-half inches. Allowing for the width of the rails, therefore, the total width of the tracks is approximately fourteen feet. The ordinance expressly declares that the privileges mentioned therein are granted to the Union Traction Company, its successors and assigns, "subject, however, to the agreements, conditions and restrictions which are imposed and mentioned in this ordinance," and expressly declares (if that were necessary) that the grant is made in consideration of those agreements, restrictions and conditions. Section 9 of the ordinance requires the Union Traction Company to macadamize Park avenue, from Depot square to the southerly side of Ridge road, at the time of constructing its road, and to macadamize the said avenue, from the southerly side of Ridge road to the southerly side of Newell avenue, within seven years from the passage of the ordinance, with six-inch macadam, laid from gutter to gutter.

It appears that after its passage and approval this ordinance was duly accepted in writing by the Union Traction Company under its corporate seal, and the acceptance filed with the borough clerk, as required by law. Afterwards the company took possession of Park avenue and constructed a double line of railway tracks thereon and operated cars upon it as a portion of its through line of street railway extending from Arlington through the borough of Rutherford to Hackensack.

On November 26th, 1894, the Union Traction Company

gave a mortgage covering all of its property and franchises then owned or thereafter to be acquired, and having subsequently made default in payments due thereon, the mortgage was duly foreclosed in the Court of Chancery of this state, and the property and franchises of the company, including its property and franchises in the borough of Rutherford, were sold at public auction, pursuant to a decree of the court, to one Giles, and a deed was made by one of the masters of the court conveying to him the property and franchises in question. In the statement of facts it is set forth that the purchase by Giles was made under and pursuant to the act of April 16th, 1897, entitled "An act concerning the sale of the property and franchises of any corporation," &c. (*Pamph. L.* 1897, *p.* 229), and that subsequently the Newark and Hackensack Traction Company was organized by Giles and others under the provisions of this act, and thereupon the property and franchises of the Union Traction Company sold to Giles became vested in the Newark and Hackensack Traction Company. Afterwards the latter company gave a mortgage covering all of its property and franchises, which upon default was foreclosed, and the property and franchises in question were sold under decree of the Court of Chancery and conveyed to one Everdell, who afterwards conveyed the same to the present respondent, the Hudson River Traction Company, the latter company being a corporation organized under the General Traction act of 1893 already referred to. *Pamph. L.* 1893, *p.* 302; *Gen. Stat., p.* 3235. The latter company is now in possession of said property and franchises, and is operating and using the double line of tracks so laid and constructed in Park avenue as a part of its street railway system, claiming the right to maintain and operate said railway in the borough of Rutherford, as the legal successor, by purchase, of the rights, privileges and franchises granted to the Union Traction Company by the ordinance above mentioned.

After the Hudson River Company acquired its title it was notified in writing by the mayor and council of the borough to proceed to macadamize that section of Park avenue now in

question, as provided in the ordinance, the seven years having expired. With this request it has not complied.

Section 7 of the Traction act of 1893 (*Gen. Stat., p.* 3237) provides that upon application being made to the common council for a location of street railway tracks, the council, after advertisement and hearing, "shall either pass a resolution refusing such location, or pass a resolution or ordinance as may be necessary or proper granting the said location, or any part thereof, under such lawful restrictions as they deem the interests of the public may require." Section 32 of the same act declares in effect that the consent of the council, whether given by resolution or ordinance, when accepted by any corporation created under the act, in a writing under its corporate seal, filed with the clerk of the public body, shall have the force and effect of a contract.

It is insisted, however, by the respondent, that the power conferred by the legislature upon the common council is limited to either denying the application for a local franchise or granting it subject to reasonable restrictions; and it is insisted that the imposition upon the company of the duty to pave with six-inch macadam the whole width of the street is not a reasonable restriction, but an attempted exercise of the power of taxation. Hence it is said that this requirement was *ultra vires* the municipal corporation.

But the question whether these restrictions are reasonable is a question of fact, and the burden of proof is upon him who asserts that the formal action of a municipal body contains elements so unreasonable as to render the action *ultra vires. Ivins* v. *Trenton,* 39 *Vroom* 501; 40 *Id.* 451. This rule applies with peculiar force where it is asserted that the unreasonable element consists in its imposition of oppressive burdens upon the recipient of a public franchise, and it appears that the recipient has solemnly accepted the franchise together with the burdens.

The respondent has failed to sustain the burden of showing the covenant for macadamizing the whole of Park avenue, from gutter to gutter, to be unreasonable. There is nothing in the facts of the case as presented to us from which we can

determine it to be so, and since the parties have stipulated that the facts they have placed before us are all the facts in the case, we must presume and do presume that the common council have not acted unreasonably in the matter.

Nor is this a rash presumption as applied to the present case. That section of the ordinance which relates to the paving in question (section 9) required that the traction company should replace the macadam pavement in Park avenue in as good condition as it should be found when the tracks were laid therein, and macadamize this avenue, from Depot square to the southerly side of Ridge road, at the time of constructing its road, with six-inch macadam, laid in the same manner as the macadam previously laid thereon, from gutter to gutter; should macadamize the same avenue, from gutter to gutter, in like manner, from Ridge road to the southerly side of Newell avenue, within seven years from the passage of the ordinance, and from the latter point to the borough limits in the same manner, from gutter to gutter, within ten years; that on all other streets where macadam was already laid the company should replace the same in as good order as found, and keep the street between the tracks and for eighteen inches on either side thereof in good order, and that on streets where no macadam was laid at the time of the ordinance the company should macadamize between its tracks and for the space of eighteen inches on either side, and keep the same in repair.

It will be seen that a discrimination was made, and, as we presume, an intelligent discrimination, between different streets, and between different portions of Park avenue, as to the time and mode of macadamizing, dependent no doubt upon varying conditions of travel and improvement.

It is a matter of common knowledge that the ordinary wear and tear arising from the passage of horses and wheeled vehicles upon a dirt road, and to a less degree upon a macadamized street, results in wearing down the surface year by year, so that while still adequate for ordinary travel in the absence of rails laid in the street, the surface must necessarily become in the course of time materially depressed, as com-

pared with a fixed construction of steel like the tracks of a street railway. In the absence of special and continual reparation, therefore, the wear of wagon traffic upon a street that is surfaced with macadam, and still more so upon a dirt street, results in leaving the railway tracks at an elevation above the surface, so as to make it difficult, if not dangerous, for vehicles to cross the tracks, and so as to render the street in the course of time highly inconvenient for ordinary vehicles. Macadam pavement, being formed of broken stone, is notoriously more durable than an ordinary dirt surface. And upon the whole, it is, as we think, an entirely reasonable restriction that the burden should be imposed upon the traction company to lay and maintain a hard-surfaced pavement upon at least so much of the street surface as to make it entirely convenient and safe for ordinary vehicles to pass to and fro across the tracks. This would render paving by the company proper at least for the fourteen feet occupied by the tracks and for a sufficient additional space on either side to give a convenient approach to the outside rails. With respect to some of the streets mentioned in section 9, the provision for paving is limited to the space between the tracks and for eighteen inches on either side thereof. As to Park avenue, the requirement is for paving from gutter to gutter. Presumably this distinction proceeded on reasonable grounds; either on account of the greater amount of traffic upon Park avenue, or because of its narrow roadway, or for other similar reasons. The case is silent, indeed, as to the total width of Park avenue from gutter to gutter. Whatever its width may be, we are not prepared to say that the requirement that the whole width should be macadamized by the traction company would be unreasonable. It is sufficient, however, for the present purpose to say that it does not appear that the width of the roadway or street is any greater than the width that would necessarily be macadamized in order to include the double line of tracks and a convenient approach on either side.

We find, therefore, that in fact the provisions of the ordi-

nance, with respect to the macadamizing of Park avenue, are not unreasonable.

Having so found, it is perhaps unnecessary to say that we have nothing to do here with the established doctrine that the use of the street for a street railroad does not impose an additional servitude upon the abutting property. *Citizens' Coach Co.* v. *Camden Horse Railroad Co.*, 6 *Stew. Eq.* 267; *Halsey* v. *Rapid Transit Street Railroad Co.*, 2 *Dick. Ch. Rep.* 380; *West Jersey Railroad Co.* v. *Camden, &c., Railway Co.*, 7 *Id.* 31; *Kennelly* v. *Jersey City*, 28 *Vroom* 293; *Montclair Military Academy* v. *North Jersey Street Railway*, 41 *Id.* 229. The question here is not that of an additional servitude imposed upon the owner of the fee, but it is a question of the propriety of action taken by the public authorities empowered to administer the public easement in the street with the view of enabling one party lawfully enjoying the same to do so without unreasonably impairing the enjoyment of the easement by other parties lawfully entitled thereto.

Nor is this case at all ruled by *Fielders* v. *North Jersey Street Railway Co.*, 39 *Vroom* 343. In that case it was expressly recognized (at *p.* 363) that the traction company would be bound by any contract it might lawfully have made with the municipality in consideration of the granting of its local privileges. The ordinance there condemned did not partake at all of the nature of a voluntary arrangement, but operated against the company wholly *in invitum*, and was attempted to be supported under the ordinary police powers of the municipality.

Were we to hold the requirement for paving Park avenue to be an unreasonable restriction, and therefore unjustified by section 7 of the Traction act, with the result of declaring section 9 of the ordinance *ultra vires* the municipality, then the whole of the ordinance, including its grant of privileges and franchises, must fall at the same time. For, undoubtedly, the provision for macadamizing is an essential part of the ordinance, without which it presumably would never have been adopted. The same reasoning applies here that is appli-

cable to an act passed by the general legislature containing some unconstitutional feature. As was said by the Court of Errors and Appeals, in *Riccio* v. *Hoboken,* 40 *Vroom* 662: "In the absence of any express declaration to the contrary contained in the act itself, the presumption is that the legislature intended any given enactment to be effective in its entirety. *Iowa Life Insurance Co.* v. *Eastern Mutual Life Insurance Co.,* 35 *Vroom* 340, 346. In seeking the legislative intent, the presumption is against any mutilation of a statute, and the courts will resort to elimination only where an unconstitutional provision is interjected into a statute otherwise valid, and is so independent and separable that its removal will leave the constitutional features and purposes of the act substantially unaffected by the process."

The ordinance before us expressly declares that the covenant for paving is a part of the consideration and a condition of the enjoyment of the franchises and privileges thereby granted. And so we certainly could not eliminate section 9 without at the same time overthrowing the entire ordinance. *Davis* v. *Town of Harrison,* 17 *Vroom* 79, 85; *Jersey City* v. *Jersey City and Bergen Railway Co.,* 41 *Id.* 360, 362.

But in our view it is not open to the traction company to raise the question that the grant of its local privileges and franchises was *ultra vires* the municipal corporation, while at the same time the company retains and uses and enjoys those privileges and franchises. The plea of *ultra vires* is not admitted in such circumstances except where it is practicable to restore the *status quo ante,* and we therefore think the present respondent is estopped from setting up that plea. *Camden and Atlantic Railroad Co.* v. *Mays Landing Railroad Co.,* 19 *Vroom* 530, 562; *Jersey City* v. *North Jersey Street Railway Co.,* 43 *Id.* 383.

It is further insisted that the stipulation between the borough of Rutherford and the Union Traction Company for macadamizing is of a character that was calculated to control and restrict the free exercise by the members of the common council of a discretion for the public good vested in them by virtue of their office, and therefore should be reprobated by

the courts. *Hope* v. *Linden Park Association, 29 Vroom* 627, is cited in support of this contention. But that was a case of corruption of a public officer by the proposed payment of money into the treasury of a private company in which he was personally concerned. Here the alleged undue consideration moved directly to the municipality for which the members of the council were acting. We do not find it an undue consideration, but if it were, there is nothing to suggest the least personal interest on the part of the members of council beyond their interest as ordinary taxpayers, and this, of course, is not sufficient to taint their action. The presumption is that they were influenced solely by the public interests, and so the Hope case, and others like it, furnish no parallel whatever.

It is further argued that, although the ordinance was binding on the Union Traction Company by reason of its acceptance, it is no duty of the respondent to do the paving work in question; that the ordinance at most constituted a contract between the borough and the former company, and that its obligations have not been assumed by the present company. It seems to us, however, that the burden of paving has devolved upon the respondent, because it must be held in law to have assumed the obligations of its predecessor in title arising out of the ordinance, whether these obligations be considered as merely contractual or as amounting also to an authoritative declaration and acknowledgment of the public duties of a public servant.

The contractual aspect of the matter is expressly declared by section 32 of the Traction act of 1893 (*Gen. Stat., p.* 3245), and has been recognized in recent decisions of this court. *Jersey City* v. *Jersey City and Bergen Railway Co.,* 41 *Vroom* 360; *Jersey City* v. *Consolidated Traction Co.,* *Id.* 364; *Jersey City* v. *Jersey City and Bergen Railroad Co.,* 42 *Id.* 367; *Jersey City* v. *North Jersey Street Railway Co.,* 43 *Id.* 383.

It is plain, from the express terms of the ordinance before us, that the agreements, restrictions and conditions therein contained, to be observed and performed on the part

of the company, entered into the consideration of the grant or consent given by the municipality. The privileges in the ordinance specified are granted to the Union Traction Company and its assigns. Even without the mention of assigns they partake so much of the character of property that they would be assignable in the absence of prohibition; and, so far from prohibition, there is express legislative authority for the assignment of such franchises, an authority that was availed of in the present case. Now, it is well settled that a covenant which enters into the consideration of a grant is a condition annexed to the enjoyment of its benefits, and so it must result from general principles, and quite aside from the considerations presently to be suggested, that the covenants and restrictions contained in the ordinance before us run with the franchises, and are obligatory upon any company to which the franchises pass, although there be no assumption in express terms by the grantee. It is, in short, entirely inadmissible to suppose that a traction company, having acquired such franchises by giving its consent to specific conditions and restrictions, could forthwith assign the franchises to a third party freed from the conditions, leaving the municipality to resort solely to the financial responsibility of the original grantee. Although there be no express assumption by the grantee such as was present in the Jersey City cases above cited, the duty rests, as we think, upon any company that enjoys the franchises to perform and fulfill the attendant covenants as a condition.

But, again, it is, in our opinion, erroneous to treat such a municipal consent, and the acceptance thereof by the street railway company, as imposing obligations of no other or higher character than those that result from the ordinary contract *inter partes*. The participants in this transaction are a branch of the lawmaking power of the state, on the one hand, and a corporation organized for public purposes, on the other. The subject of the treaty is a matter of purely public concern. The company, under the first section of the general act (*Pamph. L.* 1893, *p.* 302; *Gen. Stat., p.* 3235), acquires, upon its incorporation, the power and capacity to

construct street railway lines anywhere, but without the privilege of constructing them in any particular street, that privilege being conditioned upon the consent of the municipality immediately concerned. The statute (section 7) prescribes that the consent of the municipality shall be granted by its legislative body, or, as the statute puts it, the "governing body;" that this shall be done after a public hearing, following published notice; that in form the consent shall be either a resolution or an ordinance, terms that are appropriate to the action of a lawmaking body. The "lawful restrictions" that are to be made in the interest of the public indicate, likewise, a legislative act. In short, the statute, as we take it, plainly imports that the common council or other governing body of the municipality is to perform a legislative function in granting a special user of the public highway to a traction company, and in setting bounds and limits to its user and imposing conditions thereon; while, on the other hand, the traction company likewise is dealt with as a public agency, and not a mere private entity; in its application to the council it not only seeks an opportunity for private profit, but it tenders itself a volunteer to the public service, offering to embark the capital of its stockholders in a public improvement and to assume correlative duties. The proceeding has for its purpose the completion of the general "charter" of the company by the acquisition of a local "franchise." It results that when the franchise is granted, subject to conditions and restrictions, and when the traction company proceeds to lay its tracks in the street and run its cars thereon, that property and those franchises become impressed with a public use that imposes the duty upon every successive holder to serve the public in accordance with the terms of the original grant. This view of the matter is not at all novel. In *Messenger* v. *Pennsylvania Railroad Co.,* 7 *Vroom* 407, Chief Justice Beasley, in speaking of a contract made by a railroad company that was intended to give to one shipper an advantage over other shippers in the rates of freight, brought out into a clear light the general *status* of such a company as a public servant. He said: "In my

opinion, a railroad company, constituted under statutory authority, is not only, by force of its inherent nature, a carrier, as was held in the case of *Palmer* v. *Grand Junction Railway,* 4 *Mees. & W.* 749, but it becomes an agent of the public in consequence of the powers conferred upon it. A company of this kind is invested with important prerogative franchises, among which are the rights to build and use a railway and to charge and take tolls and fares. These prerogatives are grants from the government, and public utility is the consideration for them. Although in the hands of a private corporation, they are still sovereign franchises, and must be used and treated as such; they must be held in trust for the general good. * * * And it seems to me impossible to concede that when such rights as these are handed over, on public considerations, to a company of individuals, such rights lose their essential characteristics. I think they are unalterably parts of the supreme authority, and in whatsoever hands they may be found they must be considered as such. In the use of such franchises all citizens have an equal interest and equal rights, and all must, under the same circumstances, be treated alike. It cannot be supposed that it was the legislative intention, when such privileges were given, that they were to be used as private property, at the discretion of the recipient; but, to the contrary of this, I think an implied condition attaches to such grants that they were to be held as a *quasi*-public trust for the benefit, at least to a considerable degree, of the entire community. In their very nature and constitution, as I view this question, these companies become, in certain aspects, public agents, and the consequence is they must, in the exercise of their calling, observe to all men a perfect impartiality."

In *Wilbur* v. *Trenton Passenger Railway Co.,* 28 *Vroom* 212, the same eminent jurist read the opinion for this court on allowing a peremptory *mandamus* to compel a traction company to perform a duty assumed by it upon accepting the ordinance of a municipality consenting to its use of the street for its tracks. The opinion concludes with these words: "The respondent, in solemn form, agreed to do that

which the process, if issued, will compel it to do, and it is certainly most difficult to comprehend how it can reasonably complain of such compulsion."

In *Bridgeton* v. *Traction Company,* 33 *Vroom* 592, a street railway company had applied for and obtained municipal consent for the location, construction and operation of a street railway, and this had been granted by an ordinance which was accepted by the company. This company leased its railroad and franchises to a second company for a term of nine hundred and ninety-nine years, the second company agreeing to assume all existing contracts relating to the construction and operation of the railway, and stipulating that the lessee would exercise all the corporate powers and every right, franchise and privilege in respect to the use, management and maintenance of the railway. A mortgage having been given, the franchises and property came, through a foreclosure, into the hands of a third company, organized by virtue of the act of 1897, already referred to (*Pamph. L., p.* 229), and this last company refused to operate a certain portion of the road. This court allowed a peremptory *mandamus* to compel it to resume and discharge its duty as a common carrier of passengers and the exercise of its franchises by operating and continuing to operate the street railway. Mr. Justice Lippincott said: "The statute places the location of the route of a street railroad in the city council, and the design of the statute, as it appears to me, is that the city shall determine that question which so closely affects public convenience, and it cannot, under any circumstances, be left to the company itself to say what portion of its route shall be operated. * * * Upon the respondent in this case the burden and duty of the operation of this road rest. It was assumed by the defendant company under the law in the exercise of its rights, privileges and franchise for the benefit of the public, and therefore it seems clear that their duty in this respect can be and should be enforced by *mandamus.*"

The above line of reasoning, and the authorities cited, dispose, at the same time, as we think, both of the insistment

that the covenants in the ordinance contained impose no obligation upon the respondent, and also of the final point raised by counsel in argument, which is that *mandamus* is not the proper remedy. This last contention is rested upon the ground that conceding the obligation of respondent company the failure to do the work in question is not a breach of duty to the public, but a failure to perform a contract by which the borough, as a municipality, would be benefited to the extent of a certain sum, easily ascertained, and that therefore there is an adequate remedy by action to recover damages for the breach of the contract. In support of this view, the decision of this court in *State* v. *Paterson and Newark Railroad Co.,* 14 *Vroom* 505; affirmed, 16 *Id.* 186, is cited. But, in our view, the case is not pertinent. There it appeared that the charter of the Paterson and Newark Railroad Company authorized it to construct the railroad along the Passaic river from Belleville to Newark, with a proviso that in passing by the lands of the Mount Pleasant cemetery the road should be constructed entirely outside and to the east of the existing stone wall embankment of the cemetery grounds, and that before entering upon its lands the company should enter into an agreement with the cemetery company to construct a suitable stone wall, not less than six feet high, on the land between the railroad and the cemetery grounds. The railroad company located its road outside of the line indicated, and before it commenced the construction thereof it executed and delivered to the cemetery company a bond in the penal sum of $30,000, conditioned to construct a wall in compliance with the charter within three years. The Paterson and Newark company became insolvent, and its property and franchises were sold to purchasers who effected a reorganization under the name of the Paterson, Newark and New York Railroad Company. This sale was made subject to a lease of the railroad and franchises previously made to the Erie Railroad Company. Subsequently this company, in turn, became insolvent, and the property and franchises were sold to purchasers who reorganized under the name of the New York, Lake Erie and

Western Railroad Company. Meantime the agreement for·
construction of the wall remained unfulfilled, no demand
having been made by the cemetery company for its erection,
nor any proceedings taken to enforce the bond, ·until some
years after the several reorganizations, and nearly twelve
years after the construction of· the railroad. Application
was then made by the cemetery company for a *mandamus*
against the Paterson, Newark and New York Railroad Com-
pany and the New York, Lake Erie and Western Railroad
Company, to require them to construct the wall. It was
held that in the act incorporating the Paterson and Newark
Railroad Company it was the legislative purpose to secure to
the cemetery company a satisfactory location of the railroad,
and an agreement for the erection of a wall, to be enforced
in the usual methods by which contracts can be enforced by
action at law or. by bill for specific performance; that the
relator had adequate legal remedy upon its contract, and if
that remedy had since become inefficacious by reason of delay
the relator could not have relief by *mandamus*. The dis-
tinction between that case and the present is, we think, quite
clear. First, the character of the obligation was essentially
different. The erection of the stone wall was of concern
only to a single property owner. Here the obligation to pave
is intended to minimize continuously and permanently the
general inconvenience to other traffic resulting from the
operation of the street railway.· In the case cited, the obli-
gation was owing to a private corporation, and in its enforce-
ment the public was in no way concerned; here, the duty is
owing to the municipality as representative of the public in-
terests. There the party aggrieved had by laches permitted
its remedy against the original obligor to become ineffica-
cious; in the present case there has been no laches; the time
for performance of the duty did not arrive pending the
tenure of the original obligor, and the present application
was made shortly after the expiration of the time limited.
In the case cited, after the giving of the bond and its accept-
ance by the cemetery company, the obligation rested wholly
in contract; in the case before us the duty was imposed by

an ordinance—a legislative act—and while the acceptance of that ordinance gave it the force of a contract, it had, in our view, the additional force already adverted to—the imposition and assumption of a public duty.

In our opinion, therefore, the rule that *mandamus* is not the proper remedy for the enforcement of contract rights of a private or personal nature, and obligations which rest wholly upon contract and involve no question of trust or public duty (*High Extr. Rem.,* § 25), has no present pertinency.

Moreover, an action for damages would be entirely inefficacious by reason of the impossibility of estimating the damages. The ordinance in question contains no clause authorizing the municipality, on the traction company's default, to do the paving and recover from the company the cost of doing it. In the absence of such a clause, we are unable to see that the cost of doing the work could be made the measure of damages. Without this there would seemingly be no pecuniary damage to the municipality as such. The practical detriment would be the absence of street paving, and the loss would fall upon the individuals constituting the public. But they, under our decisions, could have no action against the traction company. It may be said that a court of equity would restrain the traction company from operating the railway unless the street paving were first done. That, of course, would punish the traction company, but at the same time it would punish the public, for whose benefit the franchise was granted. For the same reason, an action of ejectment by the municipality is not to be considered as an adequate remedy. What the situation requires is not that the company shall be driven from the streets, but that it shall be required to perform its public duty in the premises.

In *High Extr. Rem.,* § 17, it is said: "It is to be borne in mind, in the application of the principle under discussion, that the existing legal remedy relied upon as a bar to interference by *mandamus* must not only be an adequate remedy in the general sense of the term, but it must be specific and appropriate to the particular circumstances of the case—that

is, it must be such a remedy as affords relief upon the very subject-matter of the controversy—and if it is not adequate to afford the party aggrieved the particular right which the law accords him *mandamus* will lie, notwithstanding the existence of such other remedy." And, again, in section 20: "The object of a *mandamus* being to enforce specific relief, it follows that it is the inadequacy, rather than the absence, of other legal remedies, coupled with the danger of a failure of justice without the aid of a *mandamus,* which must usually determine the propriety of this species of relief."

Such was the view adopted by our Court of Errors and Appeals in *Jones Company* v. *Guttenberg, 37 Vroom* 659, 669.

For like reasons it is settled that a *mandamus* may properly issue, notwithstanding that for failure to do the thing required an indictment would lie. *In re Trenton Water Power Co., Spenc.* 659; *High Extr. Rem.,* § 18, and note.

So, also, the existence of a possible equitable remedy is no bar to a *mandamus,* although under certain circumstances it may influence the discretion of a court of law upon application made for the allowance of this writ. The adequate remedy whose existence prevents resort to *mandamus* must be a legal remedy. *State* v. *Holliday, 3 Halst.* 205; *High Extr. Rem.,* § 20.

In the present case, there being, in our view, a clear right on the part of the relator to require the respondent to do the street paving in question, and no other legal process existing for enforcement of this duty, nor even any legal action that would furnish adequate recompense for its neglect, it seems to us the writ of *mandamus* ought to issue. Since the matter is of public importance, and all the facts in the case are before us, the writ may be peremptory in form.