No. 19,196.

THE CITY OF EMPORIA, *Appellee*, v. THE EMPORIA RAILWAY AND LIGHT COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. MANDAMUS—*Street Railway Must Maintain Its Track in Good Condition for Public Use and Travel.* A street railway company may be compelled by mandamus to restore its track to a condition that will present no obstacle to the use and travel as a public thoroughfare of a paved street over which it has been laid, although the cause of its defective condition is due to a faulty method of paving employed by a paving company pursuant to a contract with the street railway company, and although the city engineer suffered such method to be used without protest.

2. SAME—*Duty Imposed—Regardless of Charter, Franchise, or Contract.* The obligation thus to restore its track to a proper condition devolves upon the street railway company, regardless of its charter or franchise or contract with the city, as one of the common-law duties which it owes to the city and to the public, which may be enforced by mandamus notwithstanding the city has a contract right to make the repair and sue the railway company therefor, and may also have the right to look to the paving company and its bondsmen for damages.

Appeal from Lyon district court; WILLIAM C. HARRIS, judge. Opinion filed April 11, 1914. Affirmed.

City of Emporia v. Street Railway Co.

*W. L. Huggins,* and *Humbert Riddle,* both of Emporia, for the appellant.

*Edwin S. Waterbury, R. M. Hamer,* and *Henry E. Ganse,* all of Emporia, for the appellee.

The opinion of the court was delivered by

WEST, J.: On April 12, 1911, the city accepted the bid of a paving company to curb, gutter and pave Twelfth avenue. On the following day a street-car franchise authorized by popular vote was accepted in writing by the assignors of the street railway company. The contract with the paving company provided for a double foundation consisting first of a subgrade of natural earth, thoroughly compacted as therein specified, upon which subgrade a course of concrete was to be laid, in no place less than four inches in thickness, and upon such double foundation was to be laid a two-inch course of asphaltic concrete. The franchise ordinance provided, among other things, that all tracks should be so constructed and maintained at all times as not in any way to impede the free use of the street by the public, and should be so laid as to interfere as little as possible with the public travel on the street, and in case of laying and relaying or repairing tracks the grantees were to put the streets in as good condition as they were before such work was done, and when the grantees should occupy any street or part thereof paved or macadamized by the city they were to repair all of that portion lying between the inside of the ties whenever the same should get out of repair and keep and maintain the track at all times in good condition, and upon failure so to repair after reasonable notice the city was authorized to make such repairs at the expense of the grantees, and if not paid within thirty days thereafter to maintain an action therefor. Another section provided that whenever it became necessary to pave any street over which tracks were laid or being laid the grantees should pay for paving between

the tracks and for 18 inches on the outside thereof, "the said work to be estimated and the construction contracted for by the city, with the contractor in the same manner and at the same price per square yard as the balance of the street is awarded to them, and payment for said paving shall be assessed and be a lien on said street railroad, to be paid for in installments in the same manner as payments are required to be made by the owners of abutting real estate in said street."

Another section provided that the grantees should furnish a bond in the sum of $5000 to secure the performance of these conditions, but such bond was never given. The paving company gave a bond in the sum of $75,000 for the faithful performance of its contract, also a maintenance bond in the sum of $5000. The railway company contracted with a construction company for the building of its line. The paving company claimed the right to occupy the streets, and objected to the placing thereon of ties and rails unless satisfactory arrangements could be made between it and the construction company. Whereupon the construction company, unknown to the city, made a contract with the paving company, by the terms of which the former was to place the track on the street in accordance with the line and grade as given by the city engineer, and make the necessary excavation, and when the track should be laid to fill up with gravel between the rails for eighteen inches on the outside thereof, uniformly within two inches from the top of the ties and thoroughly tamped with gravel, and that thereupon the paving company should place upon this surface four inches in depth of concrete and two inches thereon of asphalt, so as to bring the finished track even with the top of the rails, and place sufficient grooves inside and along the rails to allow the flanges of the wheels to run therein freely. The construction company was to pay the paving company twenty cents a square yard for the

strip in addition to the paving company's contract price with the city. About this time the defendant requested the paving company to use brick instead of asphaltic concrete for surfacing the part of the street to be occupied by the railway track, which under the contract was permissible if approved by the city commission. The paving company advised that it had already made a contract with a Kansas City firm for asphaltic concrete, and as no satisfactory arrangements could be made with that firm it would be impossible to accede to the defendant's request. The commissioners of the city were twice requested by the defendant to permit the use of brick in this way, but took no action upon such requests. The cost of paving the strip occupied by the street railway track, except the cost of excavating, was assessed against the property of the railway company, payable in. ten annual installments, two of which installments were paid in July, 1913. The court found that the track was constructed in conformity with the contract entered into between them, but that the excavation was made about ten inches below the level of the subgrade established for the paving, in which excavation were placed the ties and rails properly united by spikes, and gravel was thrown in and the track elevated to the proper grade by tamping the gravel under the ties and to within about two inches .of the top thereof; that the subgrade upon which the foundation was laid was not compacted, but upon this foundation was laid four inches of concrete, and upon this two inches of asphaltic concrete. It was also found by the court that the plaintiff exercised no control over the defendant in digging the trench or in laying its track; that the commissioners, city engineer and the paving contractor had personal knowledge in a general way of the manner in which it was being done, the city engineer having general supervision of all paving in the city, and the laying of concrete and the asphaltic surface of the strip in controversy being under his general direction the

same as the rest of the street. It was found that the entire cost of the reconstruction of the street-car track on the strip would be from $11,000 to $14,000, but that the evidence did not show the cost of repairing if repairs would be practical. It was testified, however, that the only way to remedy the defect was by reconstruction. It was found that the operation of loaded cars caused the track in question to vibrate and to sink underneath the weight, in places, from three-quarters of an inch to an inch; that later the asphaltic concrete on the inside of the rails began to disintegrate and pull loose, caused by the vibration and due to the instability of the base or foundation; that the asphaltic surface breaking away from the concrete base permitted the water to enter and freeze and thaw, causing the asphaltic surface to curl up to such an extent as to interfere with traffic; that the paving company, with the knowledge of the city and the consent of the defendant, attempted to repair this pavement on the strip in question by cutting out the broken portion of the asphaltic concrete next to the inside of the rails and filling in with concrete, which attempt was a failure owing to the fact that the concrete used in such repair work did not adhere to the concrete foundation, and to the fact that the running of the cars caused such vibration and sinking as to separate the concrete repair from the four-inch base. It was also found that the gravel used by the defendant as ballast or foundation for its track was of inferior quality, insufficiently tamped, and that part of it was put in after a rain, when the trench was soft and muddy. "The use of inferior material and poor construction, as above stated, is the primary cause of the condition of the said street at the time of the commencement of this action and now." That by reason of these things the track became uneven and in bad condition, and at the time of the trial was in numerous places from one to three inches below the level of the street, and the strip in question was unsafe and unfit

for public use and travel. That the paving on the street in question had never been fully accepted solely because of the condition of the strip, but all of the paving except that on the strip had been approved as satisfactory, and the paving company had been paid substantially in full therefor; that in June, 1912, the city sued the paving company and the surety company, charging faulty construction in that part of the street occupied by the street-car track and seeking to recover damages, but after learning of the contract between the construction and paving companies this action was dismissed without prejudice. The trial court after taking the matter under advisement gave judgment for the plaintiff and ordered the defendant to proceed forthwith to repair the strip in question, using either brick or asphaltic concrete as surfacing, and to put such strip in such condition as would present no obstacle to the use and travel of the street as a public thoroughfare. The railway company appeals and insists that the judgment is wrong because the city has a plain and adequate remedy in the ordinary course of the law; that the cause of action, if any, is doubtful, and that the alleged duty sought to be enforced is private and contractual and not of a public nature subject to enforcement by mandamus. It is complained that some of the findings are unsupported by the evidence and that others are contrary to the evidence, also that the court erred in refusing to make certain findings requested by the defendant.

We can not say that any of the findings are contrary to or entirely unsupported by the evidence or that material error was committed in refusing those requested by the defendant.

Certain things are clear beyond question. The strip was not paved in accordance with the requirements of the paving company's contract with the city. The method of the work, however, was fully known and understood by the city engineer and no protest appears

to have been made while the work was in progress. The defendant desired and attempted to use brick instead of asphaltic concrete for the top course but was not permitted so to do, and had such permission been given some features of the alleged defect would have been eliminated. An attempt was made by the paving company to repair the defects complained of, but apparently without success. The work required by the trial court's order is practically a reconstruction. According to the testimony of various witnesses versed in street railway construction gravel is fully as good as concrete for foundation purposes. The trouble now complained of seems not to consist of any defect in the track itself, but in the kind of paving and foundation used in the eight-foot strip, and there is much plausibility in the argument that for this the city should look to the paving company and its bondsmen or follow its contract and make the repairs and look to the defendant for the expense.

Can the extraordinary remedy of mandamus be invoked in a case of such apparent hardship, or has the city a different but sufficient means of redress? It is demonstrated that the paving was not done according to the contract with the city, but differently according to the express terms of the contract made, without .the knowledge of the city, between the construction and paving companies, and that the kind of paving actually done was well known to the city engineer. But whether or not the city should be held to be at fault for negligently or tacitly permitting such work to be done, there is no escape from the fact that the defendant is directly responsible in the way already indicated, and if the method of paving thus used has proven bad it can not shirk the blame, and it remains to consider whether it can evade or avoid the responsibility. It is under a clear contractual duty to put the track in proper shape, and if the city must be restricted to an ordinary action at law the bad condition of the street

and the track must continue or grow worse pending the final result of such litigation. The recognized duty of the city to keep its streets in safe condition must be given due consideration, for the entire traveling public using the street are dependent on the city for the safety of passage thereover. No matter from what cause or by whose fault the paving was improperly done the franchise ordinance requires the railway company to keep its track in condition, and it was its duty to bear this in mind when contracting for the paving of the strip. It is unfortunate if to repair the track a repavement of the strip is necessary, but that feature of the case is not determinative. Counsel cite numerous decisions to support their contention that mandamus will not lie, and assert that most of those relied on by the plaintiff are aside from the facts here involved and hence inapplicable. But a consideration of the situation presented convinces us that the railway company, both as an occupier of a public street and as a contracting party, owes it to the city to put the track in proper condition. It is the duty of a street railway company, whether so obligated by its charter or franchise or not, to keep its track in repair so as not to obstruct travel across or upon it. (*Railway Company v. State,* 87 Tenn. 746, 11 S. W. 946; 33 Cyc. 236; 36 Cyc. 1403.)

"The participants in this transaction are a branch of the law-making power of the state, on the one hand, and a corporation organized for public purposes, on the other. The subject of the treaty is a matter of purely public concern." (Pitney, J., in *Rutherford v. Hudson River Traction Co.,* 73 N. J. Law, 227, 237, 63 Atl. 84.)

"We think public policy and public necessity alike demand that street railway companies should see to it that the streets between the rails and next to them on all sides should be kept level with the rails, or so nearly level as to not endanger the lives or property of those having a right to cross them or be upon them." (*Groves v. Louisville Ry. Co.,* 109 Ky. 76, 85, 22 Ky. Law Rep. 599, 58 S. W. 508, 52 L. R. A. 448, 457.)

"Independently of charter provisions and of subsequent statutes and ordinances, the street railway company is bound so to conduct and maintain its road that the free use of the whole street by the public shall not be materially impaired." (23 A. & E. Encycl. of L., 1st ed., 983.)

To enforce the performance of similar duties mandamus is held to be the proper remedy. (26 Cyc. 341; 36 Cyc. 1402; *State of Indiana v. Lake Erie & W. R. Co.*, 83 Fed. 284; *Rutherford v. Hudson River Traction Co.*, 73 N. J. Law, 227, 63 Atl. 84.)

It is argued, however, that although the duty to repair exists, still under the rule in this state and in view of the equities of the case the plaintiff should be relegated to its ordinary action. It was held in *The State v. Bridge Company*, 20 Kan. 404, that obligations arising upon contract merely, and involving no trust, can not be enforced by mandamus; but here, as we have seen, there is the plain public duty added to a contractual obligation. In *The State v. Mo. Pac. Rly. Co.*, 33 Kan. 176, 5 Pac. 772, it was argued that mandamus will not lie to enforce an ordinance or to compel the performance of a duty not resulting from an office, trust or station, but it was said that a railroad company is a *quasi*-public corporation, and its powers are conferred upon it not only for its own but for the public's benefit, "and whenever it neglects or fails to perform any of its corporate duties, it may generally be compelled to perform the same by an action of mandamus." (p. 185.) In *The City of Potwin Place v. Topeka Rly. Co.*, 51 Kan. 609, 33 Pac. 309, it was expressly held that a street railway company may be required by mandamus to perform public duties in accordance with the provisions of a city ordinance under which it was constructed. "Whether the company's duties be denominated contract obligations, or duties imposed by the terms on which a franchise has been granted, the duties are essentially public, and such that no adequate rem-

edy in the ordinary course of legal proceedings is afforded the plaintiff and its citizens." (p. 615.) This ruling was followed with approval in *City of Topeka v. Water Co.*, 58 Kan. 349, 49 Pac. 79, holding that a water company could by mandamus be compelled to extend its mains as required by its contract with the city. In *The State v. Irrigation Co.*, 63 Kan. 394, 65 Pac. 681, in holding that an irrigation company could be compelled to construct bridges over highways which it had obstructed, it was said:

"We think that if the performance of a duty is enjoined by law, either by express statutory enactment or by the rules of the common law, its performance may be compelled by mandamus." (p. 399.)

To the same effect is *Rea v. Telephone Co.*, 87 Kan. 665, 668, 669, 125 Pac. 27.

While the equities of the case invoked by counsel are somewhat unusual, a careful consideration of all the facts and circumstances shown fails to convince that the city has estopped itself to pursue the remedy sought, and the foregoing authorities leave no room for doubt that the order made by the trial court is well within the rule applicable to mandamus.

The judgment is therefore affirmed.

PORTER, J. (dissenting) : In my opinion it is unjust and inequitable to hold the railway company responsible for the defect in the pavement. The city should look to the paving company alone for the damages and for the repairs. That company took the contract to do the paving and gave the city a bond for the faithful performance of the contract, and for any defects in the work it is the one responsible. That company did the work of paving, although by mutual agreement with the defendant the latter was permitted to place its ties and rails in the excavated portion of the street before the paving was completed, and paid the paving com-

pany a bonus for permission to do this. In the situation in which it found itself placed, the defendant offered and did all that was fair and reasonable. It endeavored in vain to secure the consent of the city that the specifications in respect to the top course should be altered, and whatever work the defendant railway company did towards paving the street was done as a mere subcontractor of the paving company.

BURCH, J. (dissenting) : I have such grave doubts respecting the conclusion of the court's decision that I am constrained to withhold assent to it.