POLK COUNTY BOARD OF SUPERVI-
SORS, Martha Willits, Chair, John Mau-
ro, Jack Bishop, Robert Kramme,
George Mills, and Tom Parkins, Polk
County Auditor, Appellants,

v.

POLK COMMONWEALTH CHARTER
COMMISSION and David Wilkinson,
Chair, Appellees.

No. 94–904.

Supreme Court of Iowa.

Oct. 14, 1994.

As Amended Oct. 18, 1994.

John P. Sarcone, County Atty., and Eliza Ovrom, Asst. County Atty., for appellants.

Lee H. Gaudineer, Jr., of Austin, Gaudineer, Austin, Salmons & Swanson, Des Moines, for appellees.

SNELL, Justice.

This is an appeal by the Polk County Board of Supervisors (Board or Board of Supervisors) and the Polk County Auditor from a final judgment granting a writ of mandamus sought by the Polk County Charter Commission (Commission or Charter Commission). The district court ordered the Board through the writ to direct the Polk County Auditor and the commissioner of elections to place on the ballot the question of adopting a proposed commonwealth charter reorganizing Polk County government. This ballot would be presented on November 8, 1994 at the general election. The writ has been executed and the order carried out placing the question on the general election ballot subject to our resolution of this appeal.

The Board and the county auditor brought a declaratory judgment action seeking a ruling that the charter, proposed by the Commission, is legally defective and ineligible to be placed on the election ballot. The Commission counterclaimed for a writ of mandamus to compel the Board to submit the proposed charter to the county auditor for placement on the election ballot. The district court determined there were no legal impediments to placing the proposed charter on the ballot, ordered the issuance of the writ, and dismissed the petition. On appeal, the question is whether there are legal deficiencies in the charter barring it from receiving the referendum of the people. We affirm.

I. Standard of Review

The district court tried this case at law. We review the court's determinations for errors at law and defer to its findings of fact if substantial evidence supports them. Iowa R.App.P. 4; *North Iowa State Bank v. Allied Mut. Ins. Co.*, 471 N.W.2d 824, 828 (Iowa 1991).

II. Factual Background

The material facts in this case are stipulated. The Commission was created pursuant to Iowa Code section 331.233A (1993). That section is contained in chapter 331, styled "County Home Rule Implementation," Part 2, entitled "Alternative Forms." Its purpose is "to study city-county consolidation

or the community commonwealth form" of government. Iowa Code § 331.233A(1). The forty-one members of the Charter Commission were appointed by city councils, the Polk County Board of Supervisors, and the Polk County legislative delegation. The Commission held its first meeting on April 28, 1992. During the spring and summer of that year, the Commission began work on drafting a proposed commonwealth charter. On January 28, 1993 the Commission filed a preliminary report discussing its progress through December 16, 1992. At that time, the Commission had not approved any proposed charter. It was planning a legislative lobbying effort to amend key provisions of Iowa Code chapter 331.

In April 1993, after the Commission's lobbying efforts failed, it began work on a new draft charter. The Commission split into committees to study in detail the key provisions of a 1992 draft rejected by the Commission.

On December 27, 1993, the Commission approved a draft charter and submitted it, accompanied with its final report, to the Board. The report represented the culmination of a twenty-month study by the Commission, twenty-eight Commission meetings and eighty committee meetings. It acknowledged the assistance received from the Polk County Board of Supervisors, Polk County staff and the 100 different members of three charter commissions and the greater Des Moines area commission. The Commission directed the Board to forward the proposed charter to the county auditor for placement on the November 1994 ballot. The Board refused, claiming the proposed charter had several legal defects barring its procession to the ballot.

The proposed charter seeks to restructure county government. It would replace the five-member Board with a seven-member "Polk Commonwealth Council," a commonwealth mayor, and a county manager. The elective offices of auditor, recorder, sheriff, and treasurer would be eliminated and their powers and duties would be combined with the new legislative council for the purpose of reorganizing their duties and functions. The commonwealth mayor would be the presiding officer and a voting member of the Council; the mayor would recommend appointments to the Council and represent the commonwealth before organizations and governmental agencies. The Commonwealth Council would have the powers of and perform the duties of a traditional board of supervisors. It also would reorganize and be responsible for the duties and functions of the auditor, recorder, sheriff, and treasurer. The commonwealth may also agree to deliver municipal services to member cities as recommended by a commission composed of a commonwealth mayor and the mayors of all joining cities in the commonwealth (Mayors' Commission). The Des Moines and Polk County Assessors' offices would be merged.

A majority vote of all qualified electors in Polk County would be necessary to adopt the charter and create the commonwealth form of government. A separate affirmative vote would be required in each city to determine if that city would join the commonwealth for the purpose of jointly receiving selected municipal services from the commonwealth. A city that does not initially join may join at a later date. A city that has joined may withdraw.

After a service is transferred to the commonwealth, it would be under the control of the Commonwealth Council. The Council would levy the taxes to pay for this service. The Mayors' Commission would no longer have any responsibility. A service would not be transferred to the commonwealth without a majority vote of the Commonwealth Council.

The Board claims the proposed charter is legally deficient in three ways. First, it claims a charter provision calling for the creation of a commonwealth Mayors' Commission violates the "one person, one vote" principle mandated by the federal and state constitutions. Second, the Board argues the proposed charter does not comply with several provisions of Iowa Code section 331.261. Third, the Board contends the Charter Commission did not substantially comply with the public hearing requirement of Iowa Code section 331.235.

III. Mayors' Commission

A. Composition and Function

Article VII of the proposed charter provides for the creation of a Mayors' Commission. The Mayors' Commission's primary purpose is to study, evaluate, and recommend the transfer of municipal services to the control of the commonwealth.

The Mayors' Commission would be composed of the commonwealth mayor, the mayor of each commonwealth member, and the mayor of other cities having fifty percent or more of their population or area within the commonwealth. Mayors of non-commonwealth member cities would have no voting power on the Mayors' Commission.

Each mayor of a city that joins as a commonwealth member would have one vote on the Mayors' Commission. According to the 1990 decennial census the population of Polk County is 327,140 persons. The populations of the cities within Polk County that could be represented on the Mayors' Commission vary widely. These cities' populations are as follows:

| | |
|---|---|
| Alleman | 340 |
| Altoona | 7,191 |
| Ankeny | 18,482 |
| Bondurant | 1,584 |
| Clive | 7,462 |
| Des Moines | 193,187 |
| Elkhart | 388 |
| Grimes | 2,653 |
| Johnston | 4,702 |
| Mitchellville | 1,670 |
| Pleasant Hill | 3,671 |
| Polk City | 1,908 |
| Runnells | 306 |
| Sheldahl | 315* |
| Urbandale | 23,500 |
| West Des Moines | 31,702 |
| Windsor Heights | 5,190 |
| Unincorporated Polk County | 23,084 |

* More than fifty percent of Sheldahl's area lies outside Polk County.

The functions of the Mayors' Commission are listed in Article VII, sections 3–10 of the proposed charter. The Commission would have the powers and duties to:

1. Evaluate municipal services of the commonwealth government and propose establishment of service areas and changes in municipal services of the commonwealth government;

2. Identify the service area to be transferred, including the description of the municipal service, geographical area to receive the service, and the service level to be provided;

3. Estimate the cost and property tax levy for each service area;

4. Identify the city employees needed to provide the service by the commonwealth government;

5. Identify real and personal property to be transferred from member cities to the commonwealth;

6. Evaluate the assumption, if any, of current indebtedness for the assets to be transferred to the commonwealth and its allocations to each member city;

7. Compute the first year property tax levy that the commonwealth government will levy for a shared service;

8. Call upon commonwealth boards, commissions, agencies, and special purpose districts to provide studies, statistics, and information pertaining to municipal service delivery;

9. Receive grants, information, and aid from private or nonprofit organizations for studies and evaluations concerning municipal service by the commonwealth government.

The Mayors' Commission (or the Commonwealth Council, city council of a commonwealth member, or the voters by petition) may, by resolution, identify municipal services for study and possible transfer to the commonwealth. If the Mayors' Commission then finds the transfer proposal meets the goals of the commonwealth, it can initiate a study of the transfer.

After the study is completed, the Mayors' Commission may recommend to the Commonwealth Council the transfer of a municipal service. This is done by issuing a report on the study, accompanied by a "resolution of transfer" outlining key elements of the proposed transfer. A resolution of transfer cannot be forwarded to the Commonwealth Council except by majority vote of the Mayors' Commission.

Once forwarded to the Commonwealth Council, a resolution of transfer may either be approved, rejected, or amended by that body. If the resolution is approved by the Council, the transfer is implemented. If the resolution is amended, it is returned to the Mayors' Commission for a vote. In the event that a resolution of transfer is rejected by the commonwealth or an amended resolution of transfer is rejected by the Mayors' Commission, a joint committee is formed to attempt a resolution.

The joint committee would be composed of two Commonwealth Council members appointed by the mayor and two Mayors' Commission members elected by its voting members. If the committee is able, within two months of its organization, to achieve a resolution, the resolution goes back through the entire transfer approval process. If the joint committee resolution fails to receive the approval of the Mayors' Commission or the Commonwealth Council, the proposed transfer resolution dies.

B. One Person, One Vote Principle

■ After laying the groundwork in *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the United States Supreme Court established the one person, one vote principle in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). 3 Ronald D. Rotunda & John E. Nowack, *Treatise on Constitutional Law* § 18.35 (2d ed.1992). This rule requires that

> whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election.

*Hadley v. Junior College Dist.*, 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45, 50–51 (1970); *Avery v. Midland County*, 390 U.S. 474, 479, 88 S.Ct. 1114, 1117, 20 L.Ed.2d 45, 50–51 (1968); *see Driskell v. Edwards*, 518 F.2d 890, 893 (5th Cir.1975). The goal of this rule is to ensure that in elections for bodies performing governmental functions, some individuals' votes do not carry greater weight

than others'. *Reynolds*, 377 U.S. at 562–63, 84 S.Ct. at 1382, 12 L.Ed.2d at 527–28.

■ In determining whether the one person, one vote principle applies to the establishment of a given body, the rule requires a threshold determination of whether the body performs governmental functions. *Driskell*, 518 F.2d at 893; *Opinion of the Justices*, 294 Ala. 571, 319 So.2d 699, 705 (1975) (en banc); *Millsap v. Quinn*, 757 S.W.2d 591, 594–95 (Mo.1988) (en banc). In order to "govern," an entity must have the power to control, determine, guide, and regulate workings or operations of the government. *Millsap*, 757 S.W.2d at 595.

■ If the entity at issue does hold governmental power, the one person, one vote rule applies unless either of two circumstances exist. First, the rule does not apply if the members of the body are appointed rather than elected. *Hadley*, 397 U.S. at 54–56, 90 S.Ct. at 794–95, 25 L.Ed.2d at 49–51. Second, the principle does not apply to an entity if: (1) it exercises only narrow, limited governmental powers; and (2) its activities disproportionately affect a specific group of individuals. *Ball v. James*, 451 U.S. 355, 364, 101 S.Ct. 1811, 1817–18, 68 L.Ed.2d 150, 158–59 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 728, 93 S.Ct. 1224, 1229, 35 L.Ed.2d 659, 666 (1973); *Hadley*, 397 U.S. at 56, 90 S.Ct. at 795, 25 L.Ed.2d at 51; *Cunningham v. Municipality of Metro. Seattle*, 751 F.Supp. 885, 890–91 (W.D.Wash.1990).

■ The Charter Commission argues that the one person, one vote principle does not govern the establishment of the Mayors' Commission because the Mayors' Commission does not perform general governmental functions. The Charter Commission stresses that the functions of the Mayors' Commission are not legislative and as a result, the one person, one vote rule does not apply.

The Board asserts that the one person, one vote principle does apply to this case because the Mayors' Commission performs governmental functions and is an elected body. The Board further contends that any reference by the Charter Commission and the district court to legislative versus administra-

tive functions is irrelevant since the determinative factor is whether the body at issue is elected.[1]

The Board asserts that *Board of Estimate of City of New York v. Morris,* 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), controls this matter and demonstrates that the one person, one vote principle governs the establishment of the Mayors' Commission. *Board of Estimate* involved a New York City board which consisted of three members elected at large and each of the elected presidents of the city's five boroughs. *Id.,* 489 U.S. at 690, 109 S.Ct. at 1436, 103 L.Ed.2d at 725. The United States Supreme Court held that the one person, one vote principle applied to the board because it was an elected body, it held a "significant range of functions common to municipal governments," and it had "considerable authority to formulate the city's budget." *Id.,* 489 U.S. at 694–96, 109 S.Ct. at 1438–39, 103 L.Ed.2d at 728–29. Since the borough presidents held equal votes to each other despite the significant difference in the size of their respective boroughs, the Court held that the board's apportionment was unconstitutional. *Id.,* 489 U.S. at 694, 109 S.Ct. at 1438, 103 L.Ed.2d at 727–28.

The New York Board of Estimate had vast powers that pervasively invaded the body politic of the city to control its life's blood. A list of its powers is as follows:

A. The Board of Estimate exclusively

i. determines the use, development and improvement of property owned by the City;

ii. approves standards, scopes and final designs of capitol [sic] projects for the City;

iii. negotiates and enters into all contracts on behalf of the City;

iv. negotiates and approves all franchises that are granted by the City;

v. grants leases of City property and enters into leases of property for City use;

vi. sets the rates for purchases of water from the City;

vii. sets the charges for sewer services provided by the City;

viii. approves or modifies all zoning decisions for the City; and

ix. sets tax abatements.

B. The Board of Estimate acting in conjunction with the New York City Council

i. recommends and approves the expense budget of the City without the participation of the Mayor;

ii. recommends and approves the capital budget of the City without the participation of the Mayor;

iii. periodically modifies the budget of the City;

iv. confers with the City Council when agreement on the budget between the two bodies is not reached;

v. overrides mayoral vetoes of budget items without the participation of the Mayor; and

vi. holds hearings on budgetary matters.

C. The Board of Estimate also

i. administers the Bureau of Franchises;

ii. administers the Bureau of the Secretary;

iii. holds public hearings on any matter of City policy within its responsibilities whenever called upon to do so by the Mayor or in its discretion for the public interest;

iv. holds hearings on tax abatements that are within the discretion of City administrative agencies; and

v. makes recommendations to the Mayor or City Council in regard to any matter of City policy.

*Id.,* 489 U.S. at 695 n. 4, 109 S.Ct. at 1439 n. 4, 103 L.Ed.2d at 728 n. 4.

In contrast, a review of the powers and duties of the Mayors' Commission listed in Article VII shows that its quiddity is adviso-

1. Although the U.S. Supreme Court at one time held that application of the rule depends on whether the body performs administrative or legislative activities, *see Sailors v. Board of Educ.,* 387 U.S. 105, 108, 111, 87 S.Ct. 1549, 1552, 1553, 18 L.Ed.2d 650, 653, 655, the Court abandoned this test in *Hadley* and made it clear that the determinative factor is whether the body is elected. *Hadley,* 397 U.S. at 54–56, 90 S.Ct. at 794–95, 25 L.Ed.2d at 49–51.

ry. The choice of words used to describe its activities illustrates that its purpose is to collate information as a basis for making a recommendation to the Commonwealth Council. The Mayors' Commission is to "call upon" agencies to provide statistics, "receive" grants and information for evaluations, "evaluate" municipal services, "propose" changes in municipal services, "identify" municipal services for "possible" transfer, "estimate" the present cost of the service area, "estimate" property tax levies, "study and evaluate" equipment and employees utilized by each member, "project" future indebtedness, "review" service areas, "recommend" Commission action, and "propose" a transfer of services to the Commonwealth Council. None of the words in quotation marks confers authority in the Mayors' Commission to exercise government powers. These functionally descriptive words do not translate into any decision-making authority impacting a citizen of Polk County. No power is given the Mayors' Commission to enforce any government action that would affect the welfare of the people of Polk County. The Mayors' Commission's reason for being is significant but its authority in law is inexistent.

The Mayors' Commission is more similar in function to the board at issue in *Millsap*. *Millsap* involved the establishment of a Board of Freeholders which was to study the St. Louis city and county governments and recommend a plan for their reorganization to voters. *Millsap*, 757 S.W.2d at 592–93. The Missouri Supreme Court held that the one person, one vote principle did not apply to the formulation of the Board. *Id.* at 595. Even though the members of the Board were appointed, the court based its decision on a threshold determination that the Board held "no general governmental powers." *Id.* The court noted:

> It "cannot enact any laws governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." It can recommend ad valorem property taxes and sales taxes, but it cannot levy and collect them.

*Id.* (quoting *Ball*, 451 U.S. at 366, 101 S.Ct. at 1818, 68 L.Ed.2d at 160) (citation omitted).

The agenda conferred on the Mayors' Commission does not sound a tick of constitutional moment next to the powers exercised by the New York Board of Estimate. The role of the Mayors' Commission, unlike the Board of Estimate, does not "situate the board comfortably within the category of governmental bodies whose 'powers are general enough and have sufficient impact throughout the district' to require that elections to the body comply with equal protection strictures." *Board of Estimate*, 489 U.S. at 696, 109 S.Ct. at 1439, 103 L.Ed.2d at 729 (quoting *Hadley*, 397 U.S. at 54, 90 S.Ct. at 794, 25 L.Ed.2d at 49). In reality, the role of the Board of Estimate more nearly resembles that of the Commonwealth Council in the case at bar, whose equal representation factor has apparently satisfied all constitutional concerns of the Board of Supervisors.

While we agree that the test is not whether the Mayors' Commission exercises administrative or legislative powers, we do not believe that the Mayors' Commission can exercise powers such as those of concern in *Reynolds* and its progeny. Like the Board of Freeholders in *Millsap*, the Mayors' Commission does not exercise general governmental powers. We therefore hold that the one person, one vote constitutional principle is not violated by the structure of the proposed commonwealth charter.

### IV. Charter Compliance with Iowa Code Section 331.261

#### A. Powers of the Charter Commission

■ In *Merriam v. Moody's Executors*, 25 Iowa 163, 170 (1868), Chief Justice John F. Dillon established a rule for the determination of local government power which came to be known as the "Dillon Rule." *City of Des Moines v. Master Builders*, 498 N.W.2d 702, 703 (Iowa 1993). This rule held that municipal and county governments could only possess and exercise powers which were: "(1) expressly granted by the legislature; (2) necessarily or fairly implied in or incident to the powers expressly granted; and (3) those indispensably essential—not merely convenient—to the declared objects and purposes

of the municipality." *Gritton v. City of Des Moines,* 247 Iowa 326, 331, 73 N.W.2d 813, 815 (1955).

The effect of the Dillon Rule was to, "render cities [and counties] incapacitated in numberless matters of vital importance to local governments." *Master Builders,* 498 N.W.2d at 703. The legislature and the electors responded by adding "home rule" amendments to the Iowa Constitution in 1968 and 1978 which removed the Dillon doctrine from Iowa law. Iowa Const. art. III, § 38A (added by amend. 25 in 1968) (municipal home rule); Iowa Const. art. III, § 39A (added by amend. 37 in 1978) (county home rule); *Kasparek v. Johnson County Bd. of Health,* 288 N.W.2d 511, 514 (Iowa 1980).

The county home rule amendment expressly provides, "[t]he proposition or rule of law that a county or joint county-municipal corporation government possesses and can exercise only those powers granted in express words is not a part of the law of this state." Iowa Const. art. III, § 39A. Section 39A gave counties power and authority to determine their local affairs subject to the limitation that they could not exercise powers inconsistent with state law. *Id.; cf. Master Builders,* 498 N.W.2d at 703–04.

The parties to this matter have entered into a stipulation which provides that the Charter Commission does not have home rule authority and that the home rule amendments to the Iowa Constitution are not applicable to the Commission. The Board therefore asserts that, as a body of county government, the Commission is subject to the Dillon Rule and holds only those powers expressly granted by or necessarily or fairly implied in the relevant statutes. As a result, the Board contends that we must strictly construe those statutes which delineate the Commission's power. The Board argues that a narrow reading of the relevant statutes will demonstrate that in drafting the commonwealth charter, the Commission has exceeded those powers the legislature has expressly granted to it.

The Commission accepts the stipulation but argues that the Dillon Rule does not control the limits of its authority because it does not perform governmental functions. The Commission instead asserts that we should construe statutes delineating the Commission's authority liberally because the statutes are remedial in nature and a liberal interpretation would best satisfy the purposes of the legislation.

The district court agreed with the Commission and held that the Dillon Rule did not control the extent of the Charter Commission's authority because the Commission did not exercise governmental power. The district court therefore held that a liberal construction which would accomplish the legislature's purposes was appropriate for statutes dealing with Commission powers.

When courts have considered application of the rule, the only determinative factor appears to have been whether the entities in question were "creatures of the state legislature." *Gritton,* 73 N.W.2d at 815. The Board asserts that since the legislature expressly subjected the Commission to the Iowa Code chapter 21 open meeting requirements, it is a governmental body subject to the Dillon Rule. *See* Iowa Code §§ 21.2, 21.3, 331.234.

We note the general rule that litigants may not bind the supreme court with stipulations as to law. *State v. Aumann,* 236 N.W.2d 320, 322 (Iowa 1975); *Zeigler v. Simmons,* 353 Mich. 432, 91 N.W.2d 819, 822 (1958); 73 Am.Jur.2d *Stipulations* § 5, at 539 (1974). The propriety of this rule is especially clear when the controversy at issue involves important public interests. *North Platte Lodge 985 v. Board of Equalization,* 125 Neb. 841, 252 N.W. 313, 314 (1934); 73 Am.Jur.2d *Stipulations* § 5, at 540. We will not be bound by a stipulation regarding statutory and constitutional interpretation.

The district court, in its excellent analysis of the legal questions prompted by the commonwealth charter, referred to language in *State v. Fairmont Creamery Co.,* 153 Iowa 702, 711, 133 N.W. 895, 899 (1911), that it characterized as prophetic. Although springing from a constitutional question, the precept announced is equally applicable to the statutory construction issues in the case at bar, where we are charged with the re-

sponsibility of allowing, under law, the voice of the people to be heard. In 1911 our court said:

> The Constitution was intended to announce certain basic principles to serve as the perpetual foundation of the state. It was not intended to be a limitation upon its healthful development, nor to be an obstruction to its programs. New days bring new problems. Legislation must meet these problems as they come; otherwise our plan of government must prove inadequate. Manifestly, we ought not to be swift to adopt such a technical or strained construction of the Constitution as would unduly impair the efficiency of the legislature to meet its unavoidable responsibilities.

*Id.*, 153 Iowa at 711, 133 N.W. at 899.

We therefore hold that the county home rule amendment, Iowa Const. art. III, § 39A, controls the extent of the Commission's powers since the Commission is a "creature of the state legislature." The Dillon Rule does not govern our interpretation of those statutes which delineate Commission functions. We construe the statutes at issue liberally in order to promote the objectives of the legislature supporting their enactment. *Bevel v. Civil Serv. Comm'n*, 426 N.W.2d 380, 382 (Iowa 1988); *Sommers v. Iowa Civil Rights Comm'n*, 337 N.W.2d 470, 473 (Iowa 1983). In addition, we consider all relevant provisions together in order to best ensure promotion of the statutory goals. *Sommers*, 337 N.W.2d at 473.

### B. Statutory Provisions

#### 1. Process for Transfer of Services

■ Iowa Code section 331.261(10) provides:

> The community commonwealth charter shall provide for the following:
>
> . . . .
>
> 10. A process by which the governing body of the community commonwealth and the governing bodies of the member cities provide by mutual agreement for the delivery of specified services to the community commonwealth.

The Board asserts that the charter violates this provision because it does not provide a method for mutual agreement between each member city council and the Commonwealth Council on the transfer of services. The Charter Commission argues that the Mayors' Commission satisfies the requirement of section 331.261(10) because the cities' mayors are the cities' chief executive officers, hold veto powers, and are part of and represent the respective city councils.

The term "process" means "a particular method or system of doing something, producing something, or accomplishing a specific result." Webster's Third New International Dictionary 1808 (1993). The result to which the legislature refers in section 331.261(10) is the delivery of specified services in the commonwealth. Under the charter, the method to achieve this result is by action of the mayors on the Mayors' Commission and the decision of the Commonwealth Council. That process, when completed, effectuates a mutual agreement for the delivery of services.

Section 372.14(1) of chapter 372 on "Organization of City Government" states that the mayor is the chief executive officer of the city and presiding officer of the council. Except for supervisory duties that have been delegated to a city manager, the mayor supervises all city offices and departments. The mayor is also authorized to take command of the police and govern the city by proclamation in time of emergency or public danger. Within the city limits, the mayor also has all the powers conferred upon the sheriff to suppress disorders. Iowa Code § 372.14(2). A city mayor is further empowered to sign, veto, or take no action on an ordinance, amendment, or resolution passed by the council. Iowa Code § 380.5. These governing powers and functions by a city's mayor are numerous and provide representation of the city by its mayor in widely differing capacities.

■ The legislature is well aware that Iowa cities are empowered to act variously by decisions of a mayor, a city council, or through other forms of government. By not stating, as it might have in section 331.261(10), that a city could only agree to a

process for delivery of services by action of its city council, the legislature left to the Charter Commission the choice of selecting the method of process. Other jurisdictions typically define "governing body" to include both the mayor and city council of a city. *See, e.g., City of Wichita, Kan. v. U.S. Gypsum Co.*, 828 F.Supp. 851 (D.Kan.1993). Since the mayor is an integral part of the governing body of a member city, a commission consisting of mayors substantially satisfies the charge of the legislature in section 331.261(10) to the Commonwealth Commission to provide a "process" for the delivery of services.

We also note that the construction urged by the Board runs counter to the liberal interpretation of this remedial legislation that we embrace in order to satisfy its purpose. To read into section 331.261(10) a requirement that only city councils can act would effectively scuttle much of the benefit predicted for the commonwealth form of government. Little would be changed from the present inert situation where intergovernmental agreements are authorized under Iowa Code chapter 28E, but seldom accomplished. Moreover, the legislature is not presumed to perform a useless act. *See Slockett v. Iowa Valley Community Sch. Dist.*, 359 N.W.2d 446, 448 (Iowa 1984). The process by which the Mayors' Commission and the Commonwealth Council mutually agree on the transfer of services satisfies the requirements of section 331.261(10).

### 2. Office of Commonwealth Mayor

■■■ Article IV of the charter provides for the creation of a "commonwealth mayor." Among other functions, the mayor would hold the power to: (1) preside over the Commonwealth Council; (2) recommend appointment of the commonwealth manager, legal counsel, and clerk after consulting with the Council; (3) advise the manager during preparation of the annual budget; (4) represent the commonwealth at functions and before organizations and governmental agencies; and (5) appoint the members of all commonwealth boards and commissions subject to consultation with and a majority vote of approval by the Commonwealth Council. The

mayor would be elected at large to a four-year term.

The Board asserts that the relevant statutes do not authorize the creation of the office of commonwealth mayor and specifically that the creation of such an office violates Iowa Code section 331.261(2) which provides "The community commonwealth charter shall provide for the following: ... 2. An elective legislative body established in the manner provided for county boards of supervisors under sections 331.201 through 331.216 and section 331.238." The Board argues that the new form of government must take the form prescribed in sections 331.201 through 331.216 for county boards of supervisors and that the office of mayor violates those provisions. In addition, the Board notes that the Commission proposed legislation in 1993 which would have included an express authorization for the creation of the office of commonwealth mayor. Since the Commission was unsuccessful in its lobbying efforts, the Board claims this indicates the legislature did not favor such an office. Moreover, the Board believes the existing statutory framework does not authorize a commonwealth mayor.

The Commission asserts that Iowa Code section 331.238 authorizes the existence of the office of commonwealth mayor. The Commission explains that its unsuccessful legislation proposed making the mayor an entity separate from the Commonwealth Council and since this proposal did not pass, the Commission wrote the charter to include the mayor as part of the Council.

The Board argues that the fact that the popularly elected mayor would preside over the council violates Iowa Code section 331.211(1)(a) which requires that a board of supervisors elect a chairperson to preside over its meetings. However, sections 331.238(2)(b) and (d) specifically authorize variations from section 331.211(1)(a). These sections provide:

2. An alternative form of county government ... may include provisions for any of the following:

. . . .

b. A supervisor representation plan for the county which may differ from the

supervisor representation plans as provided in division II, part 1.

. . . .

d. The method of selecting officers of the board and fixing their terms of office which may differ from the requirements of sections 331.208 through 331.211.

The fact that the mayor may have greater powers than other supervisors in some areas is not fatal to the formulation because section 331.238 specifically provides for "[t]he combining of duties of elected officials." There is also no prohibition in sections 331.201 through 331.216 against supervisors holding the authority to perform the functions granted to the mayor.

■ The fact that the Commission failed in its lobbying efforts does not demonstrate that the existing statutes do not authorize the office of commonwealth mayor. We are aware that in the combative and compromising process of legislating there are many reasons for a failure of legislation to pass other than a rejection on the merits. Even without a fortified legislative directive, section 331.238 grants broad authority for alternative forms of government to differ from the prescriptions of sections 331.201 through 331.216 by: (1) including a differing supervisor representation plan; (2) providing a different method for selecting council officers; (3) employing different rules of procedure; and (4) combining the duties of elected officials. Iowa Code §§ 331.238(2)(b), (d), (e), (f). In addition, the last paragraph of section 331.261 provides "The community commonwealth charter may include other provisions not inconsistent with state law." Sections 331.238 and .261 indicate an intention to grant the Commission broad powers to craft the new governmental form.

### 3. Transfer of Taxing Authority

■ Iowa Code section 331.261(8) provides that the community commonwealth charter must contain "[a] formula for the transfer of taxing authority from member cities to the community commonwealth governing body to fund the delivery of regional services." The Board asserts that this section required the Commission to place a precise mathematical formula in the charter. The Board further points to sections 331.261(7), 331.263(1), and 331.263(2) as evidence that 331.261(8) requires the inclusion of a precise mathematical formula. Specifically, the Board refers to section 331.263(2) which states, in part, that "[t]he governing body of the community commonwealth shall have the authority to levy county taxes and shall have the authority to levy city taxes to the extent the city tax levy authority is transferred by the charter to the community commonwealth." The Board further points out that other statutes, when referring to "formulas," refer to a specific mathematical representation.

The Commission responds by arguing that we should read the reference in section 331.261(8) to a "formula" as merely requiring a method or process by which cities will transfer taxing authority to the commonwealth. The Commission asserts that since the charter does include a system for the transfer of taxing authority, this satisfies the requirement of section 331.261(8).

"Formula" is not limited in definition to "a group of numerical symbols." In fact, both parties in their briefs note that one definition of "formula" is "a conventionalized statement intended to express some . . . principle esp[ecially] as a basis for . . . action." Webster's Third New International Dictionary 894 (1993).

Article VII of the Charter provides a detailed methodology for the transfer of tax authority from the cities to the commonwealth. First, the Commonwealth Council, Mayors' Commission, city council of a member city, or group of commonwealth voters may identify a service for proposed transfer. If the Mayors' Commission decides that transfer of this service will meet the Article VII, section 1 efficiency goals, it then initiates a study of the service.

Article VII, section 5 provides numerous factors which the Commission must analyze in determining the tax levy necessary to support the service. If the Commission decides to recommend the transfer of the service, it must present the report along with a "resolution of transfer" to the Commonwealth Council. The resolution must include

"[t]he property tax levy that the Commonwealth Government will levy and the fees and other sources of revenue it will utilize for each Member to deliver the service area for the initial fiscal year."

If the Council accepts the resolution, the charter requires that the tax levy for the first fiscal year for delivery of the service will be that included in the resolution. After the first year, the Council estimates the cost and levy required to fund the service.

Article VII clearly establishes a formula for the transfer of tax authority from the cities to the commonwealth. As the district court properly noted, in the context of a new form of government, a precise mathematical formula would be impractical if not impossible. Section 331.261(8) does not require a reduction of the methodology to a "group of numerical symbols." The extent to which the proposed method may impact city credit ratings or tax rates is an issue for citizens to decide at the voting booth.

V. Compliance with Public Hearing Requirement

 The Board argues that the Commission violated Iowa Code section 331.235(2) by failing to comply with the section's public hearing requirements. The Commission asserts that a public hearing it held on November 9, 1993 substantially complied with the statutory requirement.

Section 331.235(2) provides:

2. Within nine months after the organization of the commission, the commission shall submit a preliminary report to the board, which report may include the text of the proposed charter.... Sufficient copies of the report shall be made available for distribution to residents of the county who request a copy. The commission shall hold at least one public hearing after submission of the preliminary report to obtain public comment. Iowa law requires that county bodies substantially comply with open meetings laws.

Substantial compliance requires that the Commission's actions must have been consistent with the meaning and purpose of the open meetings provisions. *KCOB/KLVN v.* *Jasper County Bd. of Supervisors,* 473 N.W.2d 171, 176 (Iowa 1991).

The Commission submitted its preliminary report to the Board of Supervisors on January 28, 1993. The Commission subsequently held a public hearing on November 9, 1993. The public notice of the hearing stated that its purpose was to obtain public comment on the recently completed draft of the charter.

The Board argues that the Commission did not comply with the statute because there is no proof that copies of the preliminary report were available for the public at the hearing. The statute, however, does not require that copies of the report be available at the hearing, it merely states that "copies of the report shall be made available." Iowa Code § 331.235(2). As a public record, copies of the preliminary report were available upon request by members of the public beginning with the report's submission on January 28, 1993.

In addition, the statute does not specify that the Commission must hold a hearing to receive public comment on the preliminary report, but instead merely states that after submission of the preliminary report, the Commission must hold a public hearing to obtain public comment. Iowa Code § 331.235(2). The purpose of the public hearing requirement was to provide the public with the opportunity to comment on the operations of the Commission, the proposed charter, and/or the preliminary report. Since the preliminary report was a matter of public record for approximately ten months before the hearing, individuals seeking to comment on it could have obtained a copy and discussed it at the meeting even if copies were not available at the meeting. Moreover, the public hearing on November 9, 1993 which solicited comment on a proposed charter available for inspection at the meeting and before was of more benefit in providing information to the public than was the preliminary report. The Commission substantially complied with the requirements of section 331.235(2).

The district court correctly found that the Commission acted within its statutorily-mandated powers in creating the proposed charter and in finding the charter free from legal

defects. The district court's grant of a writ of mandamus compelling the Board to place the question of the adoption of the proposed charter on the election ballot is therefore affirmed.

**AFFIRMED.**

All Justices concur except CARTER and ANDREASEN, JJ., who concur in part and dissent in part and LAVORATO, J., who takes no part.

CARTER, Justice (concurring in part; dissenting in part).

Although some would consider any judicial action to invalidate the proposed commonwealth charter, in whole or in part, to be an unwarranted intrusion into the political process, it should not be viewed in that manner. The issues presented in this declaratory judgment action relate to the legality of specific portions of the proposed charter rather than the merits of commission charter government as such. A substantial change in the form of local government is a serious issue that should not be taken lightly. Manifestly, if there are statutory requirements to be observed in this process, those requirements should be met. If the proposed charter does not conform to the enabling statutory law, this court has an obligation to so rule. These are questions that, if not decided now, would in all likelihood become the basis of legal challenges lodged after the time and expense of an election on this particular plan.

Perhaps the appellants have made a tactical error by lodging a series of infirm legal challenges that have directed the scrutiny of the majority of the court away from a clearly meritorious challenge to the proposed charter. This relates to the requirement of subsection 10 of Iowa Code section 331.261 (1993). That statute provides:

> The community commonwealth charter shall provide for the following:
>
> . . . .
>
> 10. A process by which the governing body of the community commonwealth and the governing bodies of the member cities provide by mutual agreement for the deliv-

ery of specified services to the community commonwealth.

Iowa Code § 331.261(10) (1993).

Nothing contained in the proposed charter provides the required process by which specified services are to be delivered to the community commonwealth through mutual agreement of the commonwealth governing body and the governing body of the affected member city. The opinion of the court mistakenly finds such process to exist in the interaction that the charter establishes between the Commonwealth Council, which the court concedes to be the "governing body" of the community commonwealth, and the Mayors' Commission, whose voting members are the mayors of the member cities of the commonwealth. To support that conclusion, the majority of the court concludes that these mayors are the governing bodies of the cities they represent. That is not a sustainable position.

The most common definition for the "governing body" of a municipal corporation is that body which performs legislative functions. *Humthlett v. Reeves*, 212 Ga. 8, 12, 90 S.E.2d 14, 18 (1955); *Borough of Rutherford v. Hudson River Traction Co.*, 73 N.J.L. 227, 238, 63 A. 84, 88 (1906); *Burch v. City of San Antonio*, 518 S.W.2d 540, 542 (Tex.1974). Clearly, the mayor of a city does not fall within this definition.

A broader definition of "governing body," not tied specifically to municipal corporations, is "[that] body which has the ultimate power to determine [an institution's] policies and control its activities." *Student Bar Ass'n Bd. of Governors v. Byrd*, 293 N.C. 594, 239 S.E.2d 415, 421 (1977). A mayor does not fall within this definition either. Nor can a mayor qualify as a "governing body" under the common understanding of that term.

The opinion of the court seeks to qualify a mayor as a governing body by listing a series of powers granted by law to the mayor of a city, including emergency powers and the power to veto resolutions and ordinances enacted by the council. These are powers granted to the mayor as chief executive officer of the city. Iowa Code § 372.14(1). Although these powers are substantial, they fall

short of conferring on the mayor ultimate control of the city's policies. The council has, by law, been granted that control. The council has the power to override a mayor's veto under Iowa Code section 380.6. Thus, in any contest between the mayor and the council over who holds the governing authority, the council wins hands down. Clearly, the legislature was cognizant of that fact when it placed the words "governing bodies" in the statute.[1]

Even if a mayor could conceivably be viewed as a "governing body" of a member city, the charter would still not meet the requirements of subsection 10 of section 321.261. That statute requires that there be mutual agreement concerning the delivery of specified governmental services between the governing body of the community commonwealth and the governing body of each member city acting individually. That requirement is not satisfied by the interaction established between the Commonwealth Council and the Mayors' Commission. The Mayors' Commission acts collectively, and there is nothing to assure that a decision by that body will accord with the wishes of an individual member city.

The majority of the court attempts to justify its decision by a suggestion that requiring mutual agreement with city councils on delivery of governmental services "would effectively scuttle much of the benefit predicted for the commonwealth form of government." This view tracks with that of counsel for the Charter Commission who, in arguing the case, made the exceedingly candid admission that this plan was chosen because mayors would probably make better judgments on these matters than council members. The clear answer to that contention is that, even if the Charter Commission is correct in that belief, the legislature mandated that the Commonwealth Council reach agreement with the city councils of the member cities rather than their mayors.

1. This conclusion is buttressed by the fact that in the same sentence containing the words "governing bodies of the member cities" the legislature also refers to "governing body of the community commonwealth." Neither the Charter Commis-

While I concur in the conclusions in the opinion of the court as to the other challenges lodged against the proposed charter, I cannot agree that the charter even minimally complies with section 331.261(10).

ANDREASEN, J., joins this concurrence and dissent.

sion or the opinion of the majority of the court dispute the fact that the latter reference is to the Commonwealth Council rather than the Commonwealth Mayor.